Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| JOSÉ A. CARLO ANTONMATTEI<br><br>Peticionario<br><br>v.<br><br>JOANNE IRIZARRY VEGA<br><br>Recurrida | TA2026CE00621 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso número: IAC1997-0072<br><br>Sobre: Liquidación de Bienes Gananciales |
|---|---|---|

Panel integrado por su presidenta, la juez Brignoni Mártir, el juez Salgado Schwarz y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 12 de junio de 2026.

Comparece la parte peticionaria, José Abel Carlo Antonmattei, mediante un recurso de *certiorari* y nos solicita que revoquemos las *Ordenes* y el *Mandamiento y Orden de Embargo Preventivo de Inmuebles* expedidas el 25 de febrero de 2026, notificadas el día 27 del mismo mes y año, por el Tribunal de Primera Instancia, Sala Superior de Mayagüez. Mediante dichos dictámenes, el foro primario ordenó el embargo de bienes a nombre de Carlo Antonmattei. Ello, con el propósito de saldar ciertas deudas, incluyendo la cantidad de $39,834.89 para habilitar un bien inmueble, objeto del *Acuerdo Transaccional* sometido el 3 de junio de 2011, sobre Liquidación de la Sociedad Legal de Bienes Gananciales, entre Carlo Antonmattei y la parte recurrida, Joanne Irizarry Vega.

Por los fundamentos que exponemos a continuación, se expide el auto solicitado y se revocan los dictámenes recurridos.

**I**

El 14 de febrero de 1997, José Abel Carlo Antonmattei (Carlo Antonmattei o peticionario) presentó una *Demanda*[1] sobre Liquidación de Bienes Gananciales en contra de Joanne Irizarry Vega (Irizarry Vega o recurrida). Alegó que, en noviembre de 1996, se decretó el divorcio entre ambos y que desde esa fecha, ciertos bienes gananciales permanecían sin ser divididos. En específico, un bien inmueble, apartamento sito en el Condominio Cerro Lindo en el Municipio de Mayagüez.

El 3 de junio de 2011, el foro primario emitió una *Sentencia por Archivo por Estipulaci[ó]n*[2], en la que aprobó la estipulación presentada por las partes e incorporó por referencia los términos de esta a dicha *Sentencia*. En el mencionado *Acuerdo Transaccional*[3], Carlo Antonmattei se obligó, en el inciso A-3, a "hacer en el referido apartamento 1-A Condominio Cerro Lindo las reparaciones para poner el mismo en buenas condiciones y hacerlo habitable, incluyendo los enseres que le son inherentes."[4]

Pasados múltiples incidentes procesales, el 2 de febrero de 2026, Irizarry Vega presentó una *Solicitud de Ejecución de Sentencia.*[5] En lo referente a la controversia ante nuestra consideración, alegó que, al momento de dicha solicitud, habilitar el inmueble conllevaba un costo de $39,834.89, y anejó cotizaciones a los efectos.[6]

El 25 de febrero de 2026, el foro primario emitió las *Órdenes* y *Mandamiento y Orden de Embargo Preventivo de Inmuebles* que

---

[1] Anejo C de la Entrada Núm. 2 del Caso Núm. TA2026CE00621 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[2] Anejo F de la Entrada Núm. 2 del Caso Núm. TA2026CE00621 en el SUMAC.
[3] Íd.
[4] Íd., pág. 4.
[5] Anejo Q de la Entrada Núm. 2 del Caso Núm. TA2026CE00621 en el SUMAC.
[6] Las referidas cotizaciones incluían: Mueblería Berríos, por la cantidad de $5,560.80; Cristalería Grand Corsair MFG., por la cantidad de $9,774.09; y New Generation Contractor, por la cantidad de $24,500.00. En total, $39,834.89.

hoy nos ocupan.[7] Mediante dichos dictámenes, el foro de instancia ordenó el embargo de bienes a nombre de Carlo Antonmattei para cumplir con la cantidad de $39,834.89 para habilitar el bien inmueble, entre otras partidas.

Inconforme, el 15 de mayo de 2026, la parte peticionaria acudió ante esta Curia mediante el recurso de epígrafe y señaló el siguiente error:

> Erró el Tribunal *a Quo* al expedir sendas órdenes de embargo con sus correspondientes mandamientos en donde fueron plasmadas como deudas a ser cobradas mediante dicho embargo, unas cantidades ilegales y sin fundamento jurídico.

En cumplimiento con nuestra *Resolución* del 19 de mayo de 2026, la parte recurrida compareció ante nos mediante un *Memorando en Oposición a la Expedición del Auto de Certiorari* el 23 de mayo de 2026. En síntesis, alegó que este foro apelativo carece de jurisdicción para expedir el auto de *certiorari*. Sostuvo ello, ya que la discreción de este Tribunal para intervenir en dictámenes post-sentencia es únicamente en aquellos casos en que el foro primario haya sido arbitrario, cometido un craso abuso de discreción o cuando surja un error en la interpretación o aplicación de una norma procesal o derecho sustantivo. Adujo que el foro de instancia admitió las cotizaciones presentadas por la recurrida, sobre los arreglos y adquisición de muebles y enseres necesarios, para que el apartamento adjudicado a su favor pueda ser habilitado.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II

### A

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una

---

[7] Anejo R de la Entrada Núm. 2 del Caso Núm. TA2026CE00621 en el SUMAC.

decisión de un tribunal inferior. *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194 (2023); *Torres González v. Zaragoza Meléndez*, 211 DPR 821 (2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021). En lo sustantivo, se le considera un recurso extraordinario, mediante el cual un foro revisor está facultado para enmendar los errores que cometió el foro revisado, cuando "el procedimiento adoptado no esté de acuerdo con las prescripciones de la ley". Artículo 670 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3491.

En cuanto al aspecto procesal de este recurso extraordinario, la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1 codifica la revisión de los dictámenes interlocutorios del Tribunal de Primera Instancia. Sin embargo, y a pesar de que la citada regla no lo contempla, el Tribunal Supremo ha expresado que el *certiorari* también es el vehículo procesal adecuado para solicitar la revisión de resoluciones y órdenes post sentencia. Véase, *Banco Popular de Puerto Rico v. Gómez Alayón*, 213 DPR 314, 336-337 (2023); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 339 (2012).

En cualquiera de estos escenarios, es aplicable la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, en la medida que esta dispone los criterios que el foro revisor debe considerar para ejercer sabia y prudentemente su decisión de atender o no las controversias ante sí. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 96-97 (2008). Véase, además, *BPPR v. SLG Gómez-López*, 213 DPR 314 (2023); *Rivera et al. v. Arcos Dorados et al.*, supra; *Pueblo v. Rivera Montalvo*, 205 DPR 352, 372 (2020). La precitada Regla dispone lo siguiente:

> El [T]ribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A)   Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

4 LPRA Ap. XXII-B, R. 40.

Sin embargo, ninguno de los mencionados criterios es determinante, por sí solo, para este ejercicio y no constituye una lista exhaustiva. *García v. Padró*, 165 DPR 324, 335 esc. 15 (2005). El Tribunal Supremo también ha expresado que, de ordinario, el tribunal revisor "no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial*". Zorniak Air Services v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992), citando a *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). Véase, además, *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).

**B**

En nuestra jurisdicción, un contrato "es un negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones". Artículo 1230 del *Código Civil de Puerto Rico de 2020*, Ley Núm. 55-2020, según enmendada, 31 LPRA sec. 9751. Así, entre las partes contratantes, las obligaciones que surgen de

estos tienen "fuerza de ley entre las partes, ante sus sucesores y ante terceros en la forma que dispone la ley". Artículo 1233 del *Código Civil de Puerto Rico de 2020*, 31 LPRA sec. 9754. De este modo, "[e]l contrato queda perfeccionado desde que las partes manifiestan su consentimiento sobre el objeto y la causa [...]". Artículo 1237 del *Código Civil de Puerto Rico de 2020*, 31 LPRA sec. 9771.

En materia de interpretación de los negocios jurídicos bilaterales, la norma cardinal es que, cuando sus términos son claros, y no dejan lugar a dudas sobre la intención de las partes, se estará al sentido literal de sus palabras. Véase, Artículo 354 del *Código Civil de Puerto Rico de 2020*, 31 LPRA sec. 6342. Sobre el particular, el Tribunal Supremo considera que los términos de un contrato se reputan claros "cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". *S.L.G. Francis–Acevedo v. SIMED*, 176 DPR 372, 387 (2009). Así, los tribunales no pueden entrar a dirimir sobre lo que las partes presuntamente intentaron pactar al momento de contratar. *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 450 (2007).

Sobre la norma de interpretación de los contratos, es preciso destacar que el Alto Foro ha puntualizado lo siguiente:

> [A]l momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a los resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas.

*SLG Irizarry v. SLG García*, 155 DPR 713, 726 (2001).

**C**

El derogado Artículo 1709 del Código Civil de 1930, 31 LPRA sec. 4821, definía la transacción como "[...]un contrato por el cual

las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado."[8] Ahora bien, el ordenamiento jurídico actual dispone, bajo el Artículo 1497 del Código Civil de 2020, que "[p]or el contrato de transacción, mediante concesiones recíprocas, las partes ponen fin a un litigio o a su incertidumbre sobre una relación jurídica." 31 LPRA sec. 10641.

Los elementos característicos de un contrato de transacción son: "(1) la existencia de una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de eliminar o superar esa controversia; y (3) concesiones recíprocas". *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 903 (2012). Los contratos de transacción se interpretan de manera restrictiva, por lo que al interpretar cuáles son los efectos, se debe establecer primero qué fue lo que se pactó. *Íd.*, pág. 904.

Los contratos transaccionales pueden ser judiciales o extrajudiciales. Los contratos transaccionales extrajudiciales son aquellos en donde las partes alcanzan un acuerdo que elimina la controversia al comenzar el pleito o durante el pleito, sin la intervención judicial. *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 730 (2018). Mientras que los contratos transaccionales judiciales son aquellos en los cuales las partes, luego de comenzado el pleito, eliminan la disputa y solicitan incorporar el acuerdo al proceso judicial, teniendo el efecto de culminar el pleito. *Íd.*

La transacción produce el efecto de cosa juzgada, "...pero no procederá la vía de apremio sino tratándose del cumplimiento de la transacción judicial". Artículo 1500 de Código Civil de Puerto Rico 2020, 31 LPRA sec. 10644; *Neca Mortg. Corp. v. A&W Dev. S.E.*, 137

---

[8] Cabe señalar que el Acuerdo de Transacción objeto del presente caso fue suscrito entre las partes y acogido por el foro primario bajo la vigencia del ahora derogado Código Civil de 1930.

DPR 860, 872 (1995). Esto quiere decir que las partes deben considerar los puntos discutidos como definitivamente resueltos, por lo que no pueden volver nuevamente sobre éstos. *Íd.* Y usualmente la transacción judicial es la única con fuerza para pedir su ejecución como si se tratase de una sentencia firme. *Íd.*

Esbozada la norma jurídica, procedemos a resolver la controversia ante nuestra consideración.

**III**

En primer lugar, corresponde analizar si procede o no la expedición del auto de *certiorari*. Para ello, debemos examinar el presente recurso a la luz de la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, y los criterios establecidos en ella. En específico, el inciso (a) de la precitada Regla, dispone que este foro apelativo tiene discreción de expedir el auto de *certiorari* si "el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho". *Íd.*

En este caso, la parte peticionaria acude ante nos para revisar la expedición de unas órdenes y mandamiento de embargo preventivo de bienes, para el cumplimiento del pago de $39,834.89 para habilitar un bien inmueble, entre otras partidas. Ello, a base de un acuerdo transaccional suscrito entre las partes. Sin embargo, a pesar de que el foro primario expidió las órdenes de embargo basándose en el incumplimiento por parte del peticionario respecto a lo pactado en el referido acuerdo transaccional, el embargo para asegurar la cantidad específica de $39,834.89, no está sustentado en derecho. Y es que, el foro primario avaló la cantidad antes mencionada, a base de unas cotizaciones presentadas por la parte recurrida. Ello, sin antes procurar indagar respecto al alcance del acuerdo basado en la intención de las partes, al disponer que el peticionario se obliga a hacer las reparaciones necesarias para poner el inmueble habitable, incluyendo los enseres que le son inherentes.

Al analizar los hechos que nos conciernen, este foro ostenta la autoridad para revisar los dictámenes recurridos, por lo que, procede la expedición del recurso de *certiorari*. Resuelto este particular, procedemos a resolver el señalamiento de error.

Como único señalamiento de error, la parte peticionaria sostiene que el Tribunal de Primera Instancia incidió al expedir ciertas órdenes de embargo con sus correspondientes mandamientos. Adujo que ciertas partidas a ser cobradas mediante dicho embargo eran cantidades ilegales y sin fundamento jurídico.

En lo referente a la controversia ante nuestra consideración, el foro primario admitió unas cotizaciones presentadas por la parte recurrida y, a base de ellas, determinó la cantidad adeudada para habilitar el bien inmueble. A saber, $39,834.89 que consiste de tres (3) cotizaciones distintas. Primero, una cotización de una mueblería, de un "loveseat", un sofá, una estufa, una nevera, un "gavetero" y un mueble adicional, por un total de $5,560.80. Segundo, una cotización de una cristalería por cuatro (4) puertas, siete (7) ventanas de seguridad y varias cerraduras, por un total de $9,774.09. Por último, una tercera cotización para una remodelación completa del apartamento que incluía, demolición y limpieza, reparaciones y resanes, sistema eléctrico, plomería de cocina y baño, cocina, aire acondicionado, pintura y cierre, por un total de $24,500.00.

La parte recurrida sostiene que el bien inmueble se encontraba inhabitable, por lo que requería la mencionada cuantía para poner el apartamento en condiciones habitables. Adujo que ello le correspondía a la parte peticionaria, puesto que este se había obligado en el *Acuerdo Transaccional* a realizar "las reparaciones

necesarias para poner el mismo en buenas condiciones y hacerlo habitable, incluyendo los enseres que le son inherentes."[9]

Ahora bien, es sabido que un acuerdo transaccional es, en esencia, un contrato entre las partes. La propia definición de una transacción conlleva, según el derogado Código Civil de 1930, *supra*, la promesa o retención por cada parte de alguna cosa. En la normativa vigente del Código Civil de 2020, *supra*, este lo define como concesiones recíprocas. Nótese que la médula de ambas definiciones es la misma. O sea, que ambas partes involucradas ceden de alguna manera y ambas están de acuerdo.

En el presente caso, las partes presentaron al foro de instancia un *Acuerdo Transaccional*, con el propósito de ponerle fin a la controversia de la liquidación de la sociedad de bienes gananciales, luego de su divorcio. Para ello, llegaron a ciertos acuerdos, donde ambas partes se comprometieron a cumplirlo. No obstante, nos encontramos frente a un asunto puramente de determinar qué implica "poner el [bien inmueble] en buenas condiciones y hacerlo habitable, incluyendo los enseres que le son inherentes". O sea, si hacerlo habitable, incluyendo los enseres que le son inherentes, comprende todo lo propuesto por la parte recurrida y detallado en las cotizaciones presentadas. O, si por el contrario, es hacer reparaciones mínimas, que sumen a una cantidad distinta a la ordenada.

No nos parece razonable admitir cotizaciones que contienen un sinnúmero de partidas correspondientes a trabajos a realizarse, sin más, bajo el pretexto de que son indispensables para hacer el apartamento habitable. Para ello, se requiere una vista a los fines de evaluar y determinar qué implica poner el apartamento habitable y qué enseres son considerados inherentes al mismo. O sea,

---

[9] Anejo F de la Entrada Núm. 2 del Caso Núm. TA2026CE00621 en el SUMAC.

determinar cuál fue la intención de las partes al momento de suscribir el referido *Acuerdo*, en cuanto al mencionado inciso.

En consecuencia, corresponde expedir el auto de *certiorari* y revocar las órdenes y mandamientos expedidos por el foro primario. Ello, a los fines de celebrar una vista y dirimir la intención de las partes en cuanto a la extensión de poner el inmueble habitable, y qué se consideran enseres inherentes, para fines del acuerdo transaccional suscrito.

**IV**

Por los fundamentos antes expuestos, se expide el recurso de *certiorari* y se revocan los dictámenes recurridos, con el fin de celebrar una vista a los fines de dirimir la intención de las partes en cuanto a la extensión de poner el inmueble habitable, y qué es considerado un enser inherente, a la luz del *Acuerdo Transaccional*.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones